# Case No. 695.

## BABBITT v. WALBRUN et al.

### [6 N. B. R. 359.]

Circuit Court, W. D. Missouri. April Term, 1871.¹

INSOLVENCY—FRAUDULENT AND SHAM SALE—EVIDENCE—ADMISSIBILITY.

[1. Under the bankrupt act of March 2, 1867, (14 Stat. 517, c. 176,) a sale out of the usual course of business of all one's stock in trade, to a person who knows the seller's insolvency, is prima facie void and fraudulent as to the purchaser, and a sale by such purchaser to persons knowing the first to have been fraudulent or a sham is void.]

[See Babbitt v. Waldron, Case No. 694.]

[See note at end of case.]

[2. A charge that the jury, to give a verdict for the assignee in bankruptcy, must be satisfied that a certain sale by the bankrupts was void or fraudulent, and that the second buyers participated in, or had reasonable cause to know of, the fraud, is sufficient, without a separate charge that participation in the fraud was essential to recover.]

[See note at end of case.]

[3. The admission of an insolvent merchant's statement, whether true or not, that he lost the money received from the sale of his stock, the reality of the sale being doubtful, taken in connection with testimony that the purchaser had no means of paying, is not ground for error, since it was not made the basis of any suggestion or instruction to the jury, and was at most irrelevant matter, which could injure neither party.]

[4. In a suit by an assignee in bankruptcy, the proceedings in bankruptcy are admissible to show the appointment of the assignee; and the introduction of the record of such proceedings up to and including the appointment, no use being made of them, because the insolvency was admitted, is not a ground for error.]

[Cited in Re Crane, Case No. 3,352.]

[In error to the district court of the United States for the western district of Missouri.

---

² [From 4 N. B. R. 121.]
¹ [Affirmed by supreme court in Walbrun v. Babbitt, 16 Wall. (83 U. S.) 577.]

[At law. Action of trover under the bankrupt act of March 2, 1867, (14 Stat. 517, c. 176,) by Babbitt, assignee in bankruptcy of Mendelson, against Walbrun & Co., to recover property alleged to have been fraudulently sold. Judgment was given for plaintiff, (opinion of district court nowhere reported, and not now accessible,) but on writ of error this was reversed by the circuit court, (Case No. 694.) Upon a new trial, plaintiff again had judgment, (opinion of district court nowhere reported, and not now accessible.) Defendant brings error. Affirmed. This judgment of the circuit court was affirmed by the supreme court in Walbrun v. Babbitt, 16 Wall. (83 U. S.) 577. See note at end of case.]

TREAT, District Judge. In order that the views of the court upon the errors assigned, may be stated briefly, and that they may be understood, a succinct statement of the case is necessary. Mendelson, doing business in Kingsville as a merchant, wrote to his brother-in-law in St. Louis to come and buy him out. Mendelson was insolvent at the time. The brother-in-law, Summerfield, went to Kingsville, and learning that Mendelson wished to sell out because the competition was so sharp that he could not make a living, bought out Mendelson at twenty-five per cent. off the cost of the stock. Immediately, Summerfield, leaving the stock in possession of M. during his (Summerfield's) absence, went to Chillicothe, Missouri, and offered to sell the whole stock to defendants at twenty per cent. off, whereby Summerfield would apparently make five per cent. on the trade. Defendants, by one of their partners, went to Kingsville with S., stopped over night at Mendelson's house, in the morning went to the store where the stock of goods was, commenced an examination of them, and upon learning that S. must leave in consequence of the alleged sickness of his wife, and upon the assurance of S. that he would make all right if the inventory was found defective, defendants paid the full inventory price at the rate agreed, and immediately shipped the goods away.

In connection with the alleged sale from Mendelson to Summerfield, and the subsequent sale by Summerfield to defendants, there were many facts and circumstances provoking inquiry, inducing suspicion, and represented differently in the sworn testimony of the respective parties thereto. The case is one where, in an effort to unravel a supposed web of fraud, the parties implicated have to be successively examined under oath; thus seeking to ascertain from unwilling witnesses what they designed to conceal, and what their interest is to keep unrevealed. In this case, as in most others of a supposed scheme of fraud cunningly devised, it was necessary to pursue the inquiry searchingly into all the facts and circumstances surrounding the two-fold transaction,

and, consequently, to permit the testimony to take a wider range than in ordinary suits at law. In doing so, many statements, voluntarily or otherwise made by the adverse witnesses who are the alleged parties to the fraud, should be carefully scrutinized, and admitted or rejected in the light of the developments made in the progress of the trial and the attitude of the witnesses. It does not follow that the plaintiff is concluded by every statement made by such a witness when called by him, nor is he precluded from proving directly the reverse to be the truth. Hence it was proper to admit the testimony objected to under this head, and to charge the jury as to the credibility of witnesses in the manner the court did, instead of doing so in the language of the instruction asked, the latter being inapplicable to the course pursued.

Applying the rules of evidence correctly, the only doubtful point is as to the admission of Mendelson's statements concerning his loss of the money alleged to have been paid to him by Summerfield. But that statement by Mendelson had to be taken in connection with the various aspects the case might assume during the trial, and especially with the testimony that Summerfield did not have the means to pay what he and Mendelson say he did pay for the stock of goods; and the fact thus stated by him, whether true or not, was not made the basis of any suggestion or instruction, and at most was treated as an irrelevant and immaterial matter from which none of the parties could be prejudiced, and least of all the defendants. Without analyzing in detail the various facts concerning which evidence was given, and the instructions asked and refused, and the different portions of the charge, the main propositions of law controlling the controversy will give all needed light as to the views entertained by this court.

It is apparent that the case throughout had two aspects, viz.: First. Whether there had been an actual or mere sham sale to Summerfield. Second. Whether the sale to defendants was actually by Summerfield, or through a mere sham contrivance ostensibly by him, but really by Mendelson. Hence each aspect of the case had to be borne in mind, and what would not have been strictly admissible in evidence in one aspect, would be in the other.

It was not for the court arbitrarily to determine which aspect the jury might under the evidence find to be the true one. It appeared that Mendelson, because he could not make a living at the business, (as he and Summerfield both swear,) sends for his married brother-in-law to buy out, for cash, a losing business; and that immediately his brother-in-law, destitute of means, perhaps, appears on the scene, pretends to buy out the concern, leaves it in charge of Mendelson, immediately proceeds to a distant town,

negotiates with defendants to sell to them, and one of the defendants accompanies Summerfield, without delay, to Kingsville, closes the bargain and ships the goods away at once. Now the inquiry was a natural one, whether the part Summerfield played was not merely a contrivance between Mendelson and himself to sell the goods to defendants nominally through Summerfield as Mendelson's vendee, but actually from Mendelson direct to defendants. That branch of the subject matter had to be thoroughly investigated. The plaintiff was not bound to accept the pretenses set up as true, but had a right to go behind them in pursuit of the facts. The instructions asked and the charge by the court relate largely to the hypothesis of an actual sale by Mendelson to Summerfield, as the consequent relation of defendants to the case as second vendees; yet the charge looked to each of the two aspects, and did not, as did the instructions which were refused, wholly ignore the other view of the case.

Treating the case in the light of the law governing a second vendee, the main proposition would be: Were defendants innocent and bona fide purchasers for value? To ascertain their status it was necessary to learn whether they paid anything on the purchase, and how much, and whether they had notice of Summerfield's title as it stood affected by his dealings with Mendelson. Necessarily, if the title was good in Summerfield, the controversy was at an end; and hence the first step was as to that title; therefore the inquiry under the bankrupt act into the alleged sale to Summerfield. As it was out of the usual course of business, it was presumptively fraudulent and void as to him, if he knew Mendelson to be insolvent, (and the insolvency was admitted,) because, as held by this court during this term, in the case of Lawrence v. Graves, [Case No. 8,138,] it is impossible to conceive how a person buying from a known insolvent all of his stock of goods (which the law presumes prima facie evidence of fraud) could be in a position other than to be put upon inquiry where reasonable cause existed to believe that the transaction was a meditated fraud. In that view the court gave the instruction most complained of. Now if Summerfield bought the goods under such circumstances the sale to him was fraudulent, unless shown by rebutting evidence to have been bona fide and honest.

If no such rebutting evidence was offered, the next step was to ascertain whether defendants had notice of the previous fraudulent transaction, or participated in it in such a way as was designed to aid the fraudulent purpose intended by Mendelson. In Clements v. Moore, 6 Wall. [73 U. S.] 312. the legal principles governing such cases are succinctly stated: "A sale may be void for bad faith, though the buyer pays the full value of the property bought. This is the consequence where his purpose is to aid the seller in perpetrating a fraud upon his creditors, and where he buys recklessly with guilty knowledge. When the fact of fraud is established in a suit at law, the buyer loses the property, without reference to the amount or application of what he has paid, and he can have no relief, either at law or in equity. * * * The cardinal principle in all such cases is that the property of the debtor shall not be diverted from the payment of his debts, to the injury of his creditors, by means of the fraud." Applying the doctrine thus laid down to the case at bar, the sale to defendants would be void if defendants had notice that the sale to Summerfield was fraudulent, or, there being no actual sale to Summerfield, if they really took title directly from Mendelson, knowing all the facts charged and the relation of Summerfield to the transaction. It was proper therefore, to admit or exclude testimony, and to instruct the jury with reference to both hypotheses. True, the whole law applicable might have been more distinctly and formally unfolded, if each hypothesis had been separately stated, and the legal rules pertaining thereto arranged under each specific head; yet it often happens that such an elaborate exposition of legal rules serves to confuse rather than aid juries.

The charge put to the jury, the essential inquiries upon which the case was to turn, was first, as to the transactions between Mendelson and Summerfield, and next as to the bona fides of defendants. As to the second inquiry, the language was: "It is not, however, sufficient in this case to find the sale from Mendelson to Summerfield to have been either void or fraudulent. In order to find the issues against the defendants you must be satisfied that they participated in the fraudulent sale, or at least had reasonable cause to know the sale to have been fraudulent." Thus both hypotheses were included, so that notice of the fraud or participation in it was declared essential to a recovery. It was not, therefore, necessary to repeat that proposition, it having been once distinctly announced.

The views expressed by the plaintiff's counsel are not broad enough to cover the case of a second vendee. The first sale being void as between the parties thereto in consequence of fraud, a second vendee being a bona fide purchaser for valuable consideration is not affected by the technical rules which obtain as to the original parties alone. Thus a purchaser from Mendelson who knew Mendelson to be insolvent, if the sale was out of the usual course of business, might have reasonable cause to believe the fraud to exist; but a purchaser from the first vendee who knew merely that it included the whole stock of Mendelson was not thereby charged with notice that the first sale was fraudulent, for other elements are essential to make the sale fraudulent and void. A

sale by an insolvent person, though known to be insolvent, is not therefore necessarily void, otherwise an insolvent person could not lawfully dispose of any of his property. But it is not necessary to go again over the ground already under this head fully stated during this term in the opinion delivered in the case of Darby v. Boatmen's Sav. Inst., [Case No. 3,571.] As previously decided in the case at bar, the purchasers from a first vendee must, in order to invalidate their title, be affected by notice of or participation in the original fraud. That is, must have been purchasers without valuable consideration or mala fide. An examination of the record shows that the proceedings in bankruptcy were offered in evidence, including the bankrupt's schedules, and certainly that record was admissible to show the fact of adjudication and appointment of the plaintiff as assignee. It appears that so much of the bankruptcy record was introduced as included all proceedings of record up to and including the appointment of assignee; and though the schedules were thus introduced as a part of that record, no use was made of them, inasmuch as the fact of Mendelson's insolvency at the time of the sale was admitted. Thus the question presented by the counsel in that respect does not arise. Juries have twice passed on this case upon the merits; and, therefore, more technical points are to be received with less favor, when the whole testimony is in the record and an examination thereof shows that the verdict was obviously for the right party. Affirmed.

[NOTE. On writ of error this judgment was affirmed by the supreme court. Walbrun v. Babbitt, 16 Wall. (83 U. S.) 577. Mr. Justice Davis, in delivering the opinion, said that section 35 of the bankrupt act of 1867 prohibited fraudulent sales, as well as fraudulent preferences, and declared that such sales out of the usual course of business should be prima facie evidence of fraud. The usual course of business in this case was to sell at retail. "But it is wholly a different thing when he sells his entire stock to one or more persons. This is an unusual occurrence, out of the ordinary mode of transacting such a business, is prima facie evidence of fraud, and throws the burden of proof on the purchaser to sustain the validity of his purchase. Scammon v. Cole, Case No. 12,432; Graham v. Stark, Id. 5,676; In re Kingsbury, Id. 7,816; Driggs v. Moore, Id. 4,083; Tuttle v. Truax, Id. 14,277. Summerfield seeks to overthrow the legal presumption that Mendelson intended to commit a fraud on his creditors, by showing that he paid full value for the goods, in ignorance of the condition of Mendelson's affairs. But the law will not let him escape in this way. The question raised by the statute is not his actual belief, but what he had reasonable cause to believe. In purchasing in the way and under the circumstances he did, the law told him that a fraud of some kind was intended on the part of the seller, and he was put on inquiry to ascertain the true condition of Mendelson's business. This he did not do, nor did he make any attempt in that direction. Indeed, he contented himself with limiting his inquiries to the object Mendelson had in selling out, and to his future purposes. Something more was required than this information to repel the presumption of fraud which the law raised in the mere fact of a retail merchant selling out his entire stock of goods. If this sort of information could sustain the sale, the provision of the bankrupt law we are considering would be no protection to creditors, for any one in Mendelson's situation, and with the purpose he had in view, would be likely to give the party with whom he was dealing a plausible reason for his conduct. The presumption of fraud arising from the unusual nature of the sale in this case can only be overcome by proof on the part of the buyer that he took the proper steps to find out the pecuniary condition of the seller. All reasonable means, pursued in good faith, must be used for this purpose. If Summerfield had employed any means at all directed to this end, he would have discovered the actual insolvency of Mendelson. In choosing to remain ignorant of what the necessities of his case required him to know, he took the risk of the impeachment of the transaction by the assignee in bankruptcy in case Mendelson should, within the time limited in the statute, be declared a bankrupt. The defendants are in no better condition than Summerfield would be if he had not transferred the stock to them, because they took his title with full knowledge of its infirmity, and must blame their own folly for the result. Ritter, the active agent of the firm in the transaction, was fully informed by Summerfield of the circumstances attending his purchase, and this information was confirmed on his arrival at Kingsville. He there found Mendelson in charge of the store, with some of the goods boxed up and some on the shelves, sure indications that the sale was recent, and that there had been no actual change of possession. These things, in connection with the residence of Summerfield in St. Louis, and his occupation there, ought to have excited the fears of a reasonable man that the sale by Mendelson was not for an honest purpose, and prompted him to make inquiry upon the subject. Ritter, instead of doing this, treated the transaction as one of ordinary occurrence, and as not imposing on him the duty of ascertaining the pecuniary status of either the vendor or the vendee. Without learning anything, or seeking to learn anything, beyond the facts that the goods suited him, and Mendelson wanted to change his business, he completed the purchase, and immediately transferred the stock to the store of the defendants in Chillicothe. If this sale can be upheld, the law which declared the title of Summerfield prima facie fraudulent could be easily rendered of no benefit, for all that would be necessary for a person buying property out of the ordinary course of business of the seller, to place it out of the reach of creditors, would be, as soon as he had consummated his purchase, to sell to another, who would acquire a good title, no matter how presumptively invalid the title of his vendor might be. It needs no argument to prove that, if the law against fraudulent sales could be evaded in this way, it would furnish no sort of protection to creditors. Ritter, when he purchased, knew the nature of Summerfield's title, because he knew, or ought to have known, that a retail dealer like Mendelson, in selling out his entire stock, was presumptively intending to defraud his creditors, if it should turn out that he had any. Of this the bankrupt law gave him distinct notice, and as he chose, like Summerfield, to remain ignorant of Mendelson's affairs, he took the hazard of Summerfield's inability to prove the fairness of his title. It follows that, if the sale to Summerfield cannot be supported, neither can the sale by him to the defendants. It is unnecessary to notice the exceptions taken to the admission or rejection of testimony, because our decision is based on the evidence which was received without objection, and about which there is no controversy."]